# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SAMUEL CARL NEYHART,<br><br>                    Petitioner,<br><br>    v.<br><br>WARDEN TYRELL DAVIS,<br><br>                    Respondent. | Case No. 1:20-cv-00432-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Idaho state prisoner Samuel Carl Neyhart's Petition for Writ of Habeas Corpus. Neyhart challenges his Idaho state court convictions for lewd conduct with a minor. (Dkt. 1.) The Court previously dismissed Claim 2(a), Claim 3 (with the exception of Claim 3(c)), Claim 4, and Claim 5 as procedurally defaulted without excuse. (Dkt. 34, 39.)

Respondent now asks for dismissal of Claim 1 on grounds that this claim is also procedurally defaulted.[1] In addition, the merits of the remaining claims, including Claim 1, are fully briefed and ripe for adjudication.

---

[1] The fact that Respondent did not previously argue, nor did the Court determine, that Claim 1 was procedurally defaulted, does not prevent analysis of that issue now. Respondent was permitted to raise procedural issues in a pre-answer motion or answer, and both a motion and an answer were filed in this case. *See* Dkt. 6. Nothing in the course of these proceedings shows that Respondent intentionally relinquished the right to raise the affirmative defense of procedural default in the answer. *See Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004). In addition, the Court's previous generalized statement that Neyhart had raised Claim 1 on direct appeal, when Claim 1 was not at issue, is not final. *See Mem. Dec. and Order*, Dkt. 34 at 10 (D. Idaho March 29, 2022); *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (stating that a federal court has "inherent procedural power to reconsider,

The Court takes judicial notice of the records from Neyhart's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. 5. Accordingly, and for the reasons explained below, the Court enters the following Order denying habeas corpus relief.

## BACKGROUND

The following facts of Neyhart's case, as described by the Idaho Court of Appeals, are presumed correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

In November 2010, the mother of a six-year-old girl, K.S., reported that Neyhart—K.S.'s uncle—had sexually molested her. *State v. Neyhart*, 378 P.3d 1045, 1048 (Idaho Ct. App. 2016).

Neyhart was first interviewed in November 2010. He was not given *Miranda* warnings at this interview, which was conducted by Detective White and Detective Duch. During the interview, Neyhart told detectives he did not want to answer questions without

---

rescind, or modify an interlocutory order for cause seen by it to be sufficient") (internal quotation marks and emphasis omitted). Thus, the procedural default status of Claim 1 can be adjudicated now.

first speaking to an attorney. (State's Lodging A-5; A-6.) Police interviewed Neyhart again in February 2013, with Detective Joslin conducting the interview. (State's Lodging A-3 at 204–05; A-7.) Neyhart *was* given *Miranda* warnings at the beginning of the February 2013 interview.

Petitioner was later charged with three counts of lewd conduct with a minor under the age of sixteen. The following evidence was adduced at trial.

K.S. testified that Neyhart molested her in his trailer three separate times. "Her testimony revealed that in each instance, the sexual contact took place in Neyhart's bed where he 'messed with [her] bottom.'" *Neyhart*, 378 P.3d at 1048 (alteration in original). K.S. testified that the third time it occurred, "Neyhart 'started messing' with her while they were in bed and under the covers. Neyhart then 'peed in [her] underwear,' which made her underwear wet." *Id.* (alteration in original).

K.S.'s mother testified that, two days after the third incident, K.S. told her what Neyhart had done. The mother "examined K.S.'s body and discovered fingerprint-shaped bruises on her legs. She also noticed that K.S.'s vagina was 'very red.'" *Id.* The mother took photographs of the injuries and gave them to police.

Less than a week later, on November 6, 2010, K.S.'s father provided police with the clothing K.S. had been wearing when Neyhart molested her the third time. "These items included a pair of junior-sized pink underwear featuring images of monkeys." *Id.* K.S.'s mother had found the underwear—which the mother had purchased for K.S.—in the laundry room of the family home. (State's Lodging A-3 at 368.) Neyhart's semen was found in the pink underwear. Additionally, "the pediatrician that had evaluated K.S.

MEMORANDUM DECISION AND ORDER - 3

during a CARES (Child at Risk Evaluation Services) interview … testified that, during a physical evaluation, she observed bruising on the upper inner part of K.S.'s thighs." *Neyhart*, 378 P.3d at 1048.

The jury was able to view the pink underwear and the photographs of K.S.'s injuries and to listen to a recording of the CARES interview. "Additionally, the State played two [edited] recordings showing the police interviews of Neyhart conducted in 2010 and 2013." *Id*.

Neyhart's defense was that he did not touch K.S. and that the pink underwear with monkeys actually belonged to Neyhart's wife, Heidi. Heidi "testified that the junior-sized pink underwear with the monkeys belonged to her and that Neyhart's semen was on the underwear because they had been intimate on the day she wore them." Neyhart's wife explained away the injuries on K.S. by testifying that she had seen K.S.'s vagina days *before* the incident and that it was "red and bleeding." Heidi also stated that she had seen K.S.'s parents discipline her "by pinching her thighs." *Id*.

Neyhart's mother attempted to explain how Neyhart's wife's underwear ended up in K.S.'s family home, by testifying "that she saw K.S.'s aunt near Neyhart's trailer a few days after the alleged sexual contact and that the aunt was carrying what appeared to be rolled up panties in her hand." *Id*. According to Neyhart's mother, K.S.'s aunt had a "guilty look" on her face. (State's Lodging A-3 at 679.)

Neyhart also testified in his own defense. In cross-examining Neyhart, "the prosecutor attempted to discredit Neyhart with his pretrial statement to police investigators that he was taking Cymbalta, a prescription medication that allegedly

MEMORANDUM DECISION AND ORDER - 4

caused him to experience semen leakage." *Neyhart*, 378 P.3d at 1049. In the 2010 interview, Neyhart had speculated that this alleged leakage problem "might explain how his semen ended up on K.S.'s underwear," for example, through K.S.'s use of Neyhart's toilet. *Id*.

To call Neyhart's credibility into question, the prosecutor referred to a document, marked as State's Exhibit 23, that she called Neyhart's "entire pharmacy record." (State's Lodging A-3 at 771.) The prosecutor attempted to use this document to show that Neyhart had lied about taking Cymbalta, as Cymbalta was not listed as one of the medications that Neyhart was taking at the time of the incident. Over several defense objections, the prosecutor questioned Neyhart about the document, claiming that she was using it to refresh his memory.

Neyhart's memory did not need to be refreshed, however. He testified that the document was not his "entire pharmacy record." Instead, Neyhart explained that Exhibit 23 was a State Pharmacy Board report that showed only the narcotic medications Neyhart was taking; Cymbalta was not on the list because it was not a narcotic. (State's Lodging A-3 at 771–77.) The prosecutor and Neyhart argued over what the document was, and it was not admitted into evidence. It turns out that Neyhart was correct, that Exhibit 23 was not an exhaustive list of Neyhart's prescribed medications, and that he had indeed been taking Cymbalta at the relevant time.

On cross-examination of Neyhart, his wife, and his mother, the prosecutor also questioned why they all "waited until trial to come forward" with the following statements: (1) K.S. was red, sore, and bleeding before the alleged sexual abuse (testified

to by Neyhart's wife); (2) the pink underwear that tested positive for Neyhart's semen belonged to Neyhart's wife, Heidi (testified to by Neyhart and his wife); and (3) K.S.'s aunt was seen "carrying panties near Neyhart's trailer shortly after the alleged sexual contact" with a guilty look on her face (testified to by Neyhart's mother). *Neyhart*, 378 P.3d at 1049.

The jury found Neyhart guilty on all charges. He received three unified sentences of life in prison with ten years fixed, to be served concurrently. *Id*. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. Neyhart unsuccessfully pursued state post-conviction relief.

Neyhart filed the instant federal habeas petition in September 2020. The following claims in the petition remain for adjudication.

Claim 1 asserts that the prosecutor violated the Fifth Amendment, during cross-examination and during closing argument, by commenting on Neyhart's silence. Sub-claim 1(a) is based on the prosecutor's questions about Neyhart's failure to disclose, during the 2010 interview with police, that (i) the pink underwear with monkeys belonged to his wife, and (ii) his wife had seen injuries on K.S. prior to the third alleged incident. Sub-claim 1(b) is based on questions about Neyhart's failure to disclose that information during the 2013 interview with police. And Sub-claim 1(c) is based on

questions about Neyhart's failure to give that same information to police after he was arrested and before he went to trial.[2]

Claim 2(b) asserts prosecutorial misconduct with respect to the use of Exhibit 23, the unadmitted State Pharmacy Board narcotics report that the prosecutor inaccurately described as a complete list of the medications Neyhart had been taking at the relevant time.

Finally, Claim 3(c) asserts that trial counsel rendered ineffective assistance by failing to file a timely notice for admission of the victim's prior sexual conduct under Rule 412 of the Idaho Rules of Evidence.[3]

## DISCUSSION

### 1.    Claim 1 Is Procedurally Defaulted Without Excuse

As noted above, Respondent argues that Claim 1, and all its sub-claims, is procedurally defaulted. The Court previously described the standards of law regarding procedural default and will not repeat them here except as necessary to explain the Court's decision. *See* Dkt. 34 at 7–9.

In brief, a petitioner may not obtain relief on a habeas claim in federal court unless he has first properly exhausted that claim by fairly presenting it to the state courts. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Raising a claim "for the first and only

---

[2] The Petition describes the sub-claims slightly differently, but the Court concludes, based on all the briefing, that the above description is the most accurate construction of Claim 1.

[3] Petitioner also cites various legal standards in his reply briefing not applicable to his present claims. To the extent he is attempting to assert new claims that are not included in the petition, the Court declines to address them.

time in a procedural context in which its merits will not be considered" except in rare circumstances does not constitute fair presentation. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). If it is now too late to raise the claim in state court, the claim is procedurally defaulted and generally cannot be raised in federal court. In addition, if a petitioner raised a claim in an improper procedural manner, and if the state court declined to address it based on an adequate and independent state procedural ground, the claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 731–732 (1991).

Only two exceptions to the exhaustion requirement exist: (1) where a petitioner establishes cause and prejudice for the failure to properly exhaust a claim; or (2) where a petitioner establishes that he is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

The simplest way to determine the procedural default issue as to Claim 1 is to compare the claim here to those claims that Neyhart fairly presented to the Idaho Supreme Court.

### A.   *Neyhart Did Not Fairly Present any Portion of Claim 1 to the State Supreme Court*

i.   <u>Sub-claim 1(c)</u>

In his opening brief on direct appeal, Neyhart raised claims that correspond to sub-claims 1(a) and 1(b) here—that the prosecutor improperly questioned Neyhart about why he testified about critical facts for the first time at trial but had said nothing about them to detectives during the 2010 and 2013 interviews. In particular, Neyhart asserted three Fifth Amendment violations that reference the 2010 and 2013 interviews:

MEMORANDUM DECISION AND ORDER - 8

> First, [the prosecutor] asked Mr. Neyhart why he did not tell
> Detective White about Heidi's observations of K.S.'s vagina.
> Second, she asked why Mr. Neyhart did not tell Detective
> White or Detective Duch that the pink underwear belonged to
> Heidi. Third, she asked why Mr. Neyhart did not tell
> Detective Joslin that the pink underwear belonged to Heidi.

(State's Lodging B-2 at 15.)

The opening brief did not contain any claim that corresponded to Claim 1(c),

which alleges improper comments based on Petitioner's silence *after his arrest and up*

*until trial*.

In its answering brief, the state responded to the Fifth Amendment claims arising

from the 2010 and 2013 interviews identified in the opening brief. The state asserted that

the prosecutor did not violate the Fifth Amendment because Neyhart was not in custody,

and there were no *Miranda* warnings given, during the 2010 interview. (State's Lodging

B-3 at 24–32.) *See Fletcher v. Weir*, 455 U.S. 603, 607 (1982) ("In the absence of the sort

of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it

violates due process of law for a State to permit cross-examination as to postarrest silence

when a defendant chooses to take the stand. A State is entitled, in such situations, to leave

to the judge and jury under its own rules of evidence the resolution of the extent to which

postarrest silence may be deemed to impeach a criminal defendant's own testimony.").

The state also argued that, after *Miranda* warnings were given during the 2013 interview,

Neyhart did not affirmatively invoke his Fifth Amendment right. (*Id*. at 32–34.) *See*

*Minnesota v. Murphy*, 465 U.S. 420, 427–28 (1984) ("[I]n the ordinary case, if a witness

under compulsion … makes disclosures instead of claiming the privilege, the government

has not compelled him to incriminate himself.") (internal quotation marks and citations omitted).

Neyhart then raised Claim 1(c) in his *reply* brief on appeal. He did so by categorizing his Fifth Amendment challenge as applying not merely to the two interviews with police, but to two additional time periods:

> [T]here were multiple time periods at issue: first, there was a custodial interrogation in 2010, during which Mr. Neyhart repeatedly invoked his rights to silence and counsel but those invocations were ignored; second, there were a number of years following the 2010 interrogation during which Mr. Neyhart did not come forward voluntarily to speak to the police; third, there was a second interrogation in 2013, at the outset of which Mr. Neyhart received a Miranda warning; *fourth, there was a period in between arrest, and arraignment and his trial, during which he again did not come forward and voluntarily speak to the police*.

(State's Lodging B-4 at 3–4.) The fourth time period identified in the reply brief corresponds to Claim 1(c) here—the prosecutor's questioning Neyhart why he did not come forward with information after his arrest but before the trial.

In addressing Petitioner's Fifth Amendment claims, the Idaho Court of Appeals denied on the merits the three challenges from the 2010 and 2013 interviews identified in the opening appellate brief—which correspond to Claims 1(a) and 1(b)—using a fundamental error analysis. *Neyhart*, 378 P.3d at 1051. However, the court of appeals did not mention the fourth time period as described in the reply brief, which corresponds to Claim 1(c).

The question thus arises whether the court of appeals denied Claim 1(c) on the merits without addressing it or, instead, declined to address the claim on a procedural

basis. If a claim has been presented to, and denied by, a state appellate court without explanation, it is presumed that the state court decided the claim on the merits unless there is "any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). This merits-presumption also applies where, as here, a state court addresses some, but not all, of a petitioner's claims. *Johnson v. Williams*, 568 U.S. 289, 298 (2013). An obvious state procedural rule pointing to a reason the claim was not addressed can rebut the merits-presumption. *Richter*, 562 U.S. at 99.

Idaho has a longstanding procedural rule that arguments raised for the first time in a reply brief will not be considered by an appellate court. *See, e.g., Gray v. Gray*, 518 P.3d 1185, 1201 (Idaho 2022); *State v. Killinger*, 890 P.2d 323, 326 (Idaho 1995); *State v. Raudebaugh*, 864 P.2d 596, 601 (Idaho 1993). Idaho's rule against raising new arguments in a reply brief is firmly established. *See Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994) ("[T]o constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default."). Petitioner has not come forward with any support indicating that the rule is inadequate or is dependent on federal law. *See Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003) ("Once the state sufficiently pleads the existence of an adequate and independent state procedural bar, the burden shifts to the petitioner to establish that the rule is not adequate or is dependent on federal law.").

This regularly applied rule leads the Court to conclude that the merits-presumption has been rebutted in this case: the Idaho Court of Appeals declined to consider Claim 1(c)

on procedural grounds. For this reason, the Court agrees with Respondent that Claim 1(c) is procedurally defaulted because it was not asserted in Neyhart's opening appellate brief on direct appeal.

      ii.      <u>Sub-claims 1(a) and 1(b)</u>

As for Claims 1(a) and 1(b), they are procedurally defaulted for a different reason. As noted above, the Idaho Court of Appeals decided Claims 1(a) and 1(b), which were properly raised in the opening brief, on the merits. However, after the court of appeals affirmed his convictions, Neyhart failed to raise these two sub-claims in his petition for review with the Idaho Supreme Court. Instead, the only Fifth Amendment claim raised in the reply brief was Claim 1(c)—the claim asserting improper commentary on Neyhart's failure to speak to police after his arrest and until trial. (State's Lodging B-4 at 3–6.)

Asserting a claim to the Idaho Supreme Court in a petition for review is a required step in the exhaustion process in Idaho. *See Boerckel*, 526 U.S. at 848 (holding that "a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort" has not properly presented those claims). Neyhart did not renew Claims 1(a) and 1(b) in the petition for review, so these sub-claims are also procedurally defaulted.

Because Neyhart raised Claim 1(c) for the first time in his reply brief on direct appeal, and because he omitted Claims 1(a) and 1(b) from his petition for review, no part of Claim 1 was fairly presented to the Idaho Supreme Court. Because it is too late to raise those claims, they are procedurally defaulted. *See Gray*, 518 U.S. at 161–62.

MEMORANDUM DECISION AND ORDER - 12

**B.      *Petitioner Has Not Shown an Excuse for the Default of Claim 1***

Neyhart has two responses to the State's procedural default argument. He first

argues that he did, in fact, raise all portions of Claim 1 on direct appeal. In the alternative,

he argues that any default should be excused.

Neyhart asserts that he raised Claim 1(c) in his opening brief by asserting that the

prosecutor improperly commented on Petitioner's failure to provide information "during

*and after*" the two police interviews. (*See* Dkt. 43 at 1–4.) Page 12 of the opening brief

contained the following statement, "[T]hroughout the trial, the prosecutor repeatedly

questioned Mr. Neyhart about why he did not give certain information to the police

during and after both interviews." (State's Lodging B-2 at 12.)

However, this vague reference in the opening brief to the time period "after" the

interviews—unaccompanied by any explanation of what Neyhart was actually

challenging—was insufficient to notify the Idaho Court of Appeals that Petitioner was

asserting a Fifth Amendment claim separate from those involved in the two police

interviews. The opening brief clearly referenced *only* the 2010 and 2013 interviews. The

Idaho Court of Appeals was not required to guess that Neyhart intended to assert other,

implicit Fifth Amendment claims that were not spelled out in the opening brief. *See

Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *as amended*, 247 F.3d 904 (9th

Cir. 2001) (holding that, for proper exhaustion, a petitioner must raise a federal claim to

the state court by "explicitly" citing the federal legal basis for his claim).

Neyhart also asserts that he fairly presented Claims 1(a) and 1(b) in his petition for

review by requesting, in the conclusion of his brief in support, that the state supreme

court "review all issues in the case." (Dkt. 43 at 4; State's Lodging B-7 at 18.) However, a petitioner does not fairly present a claim "when an appellate judge can discover that claim only by reading lower court opinions in the case." *Baldwin v. Reese*, 541 U.S. 27, 30–31 (2004). Thus, because Neyhart did not expressly argue Claims 1(a) or 1(b) in the petition for review, the claims are procedurally defaulted.

Neyhart also asks the Court to apply the cause and prejudice exception to excuse the default of Claim 1. (Dkt. 43 at 4.) He asserts that failing to fairly present the claim in state court was "gross ineffective assistance of counsel." (*Id*.)

Ineffective assistance of counsel can, in some circumstances, excuse the procedural default of a habeas claim. However, a petitioner cannot rely on such alleged ineffectiveness as cause unless the petitioner also fairly presented that same ineffective assistance claim to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000) ("A claim of ineffective assistance ... generally must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.") (internal quotation marks and alteration omitted).

Here, Neyhart never raised in the Idaho Supreme Court a claim that his direct appeal counsel was ineffective for failing properly to assert Claim 1. (*See* State's Lodging D-1 (opening brief on post-conviction appeal).) Nor has he established cause and prejudice for that failure. Therefore, the alleged ineffectiveness of direct appeal counsel cannot constitute cause to excuse the default of Claim 1.

Neyhart has also failed to establish that he is actually innocent. He has presented no new, reliable evidence to support any such argument. *See Larsen v. Soto*, 742 F.3d

1083, 1096 (9th Cir. 2013) (stating that cases where the actual innocence gateway standard has been satisfied have "typically involved dramatic new evidence of innocence").

For the foregoing reasons, the Court must dismiss Claim 1 in its entirety. The Court now turns to the merits of Neyhart's remaining claims.

**2.      Standard of Law for Merits Adjudication**

A federal court may grant habeas corpus relief when it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief must be denied unless the state court's adjudication of the petitioner's claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The term "unreasonable" in § 2254(d) is reserved for "extreme malfunctions in the state criminal justice system," not for "ordinary error" or even for cases "where the petitioner offers a strong case for relief." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (internal quotation marks omitted). Accordingly, a federal court reviewing a

MEMORANDUM DECISION AND ORDER - 15

state court's adjudication of a claim on the merits "must carefully consider all the reasons and evidence supporting the state court's decision." *Id*. Courts are not permitted "to essentially evaluate the merits *de novo* by omitting inconvenient details from its analysis." *Id*. (internal quotation marks and alteration omitted). Instead, "[d]eciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks and citations omitted). Deference is required under § 2254(d) even if the highest state court denied the petitioner's claim without expressly addressing it. In such a case, the Court must "'look through' the unexplained decision to the last related state-court decision that ... provide[s] a relevant rationale." *Id*. at 1192. The Court then presumes that "the unexplained decision adopted the same reasoning." This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

When a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis omitted).

The AEDPA standard is extraordinarily high, and a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong. Rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Williams*, 529 U.S. at 411. If there is *any* possibility that fair-minded jurists could disagree on the correctness of the state court's decision, § 2254(d)(1) precludes relief. *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013); *Richter*, 562 U.S. at 101–02. In other words, if one fair-minded jurist could agree that the state court's decision is reasonable, habeas relief must be denied—even if other fair-minded jurists would disagree.

MEMORANDUM DECISION AND ORDER - 17

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of the United States Supreme Court, as of the time the state court rendered its decision. *Williams*, 529 U.S. at 412. The habeas statute does not require an *identical* factual pattern before a legal rule must be applied. Rather, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *See White*, 572 U.S. at 427.

On the other hand, if a court must *extend* a rationale before it can be applied to the facts at hand, then by definition the rationale was not clearly established at the time of the state court's decision. *Id.* at 407. A federal habeas court "may not overrule a state court for … holding a view different from its own" when the precedent from the Supreme Court "is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). Although circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent, *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000), a federal court may not use circuit law to refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific legal rule that the Supreme Court itself has not announced, *Lopez v. Smith*, 574 U.S. 1, 7 (2014).

If no Supreme Court decision has confronted the specific question presented by a state prisoner's federal habeas petition—that is, if the circumstances of a petitioner's case are only generally similar to the Supreme Court's precedents—then the state court's decision cannot be "contrary to" any holding from the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). By the same token, a state court cannot

MEMORANDUM DECISION AND ORDER - 18

unreasonably apply established federal law that does not exist. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, if (1) a claim was adjudicated on the merits in state court, and (2) the underlying factual determinations of the state court were not unreasonable, then evidence that was not presented to the state court cannot be introduced on federal habeas review. *See Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Instead, state court factual findings are presumed to be correct and are binding on the federal court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Kirkpatrick v. Chappell*, 950 F.3d

1118, 1131 (9th Cir. 2020) (holding that § 2254(e)(1) "appears to apply to all factual determinations made by state courts"). "If reasonable minds reviewing the record might disagree about the finding in question," the finding is not unreasonable under § 2254(d)(2). *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019) (internal quotation marks and alterations omitted).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to or an unreasonable application of Supreme Court precedent under subsection (d)(1), or by establishing the state court's decision was based on an unreasonable factual finding under subsection (d)(2)—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), as modified by *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021).

Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002); *Kirkpatrick*, 926 F.3d at 1170 ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits [by a state court]."). Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence

MEMORANDUM DECISION AND ORDER - 20

outside the state court record, except to the extent that § 2254(e)(2) might apply. *See Murray*, 745 F.3d at 1000.

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). A "reasonable possibility" of prejudice is insufficient. *Brecht*, 507 U.S. at 637.

Because § 2254(d) applies to harmlessness determinations of state courts, a federal court on habeas review cannot find an error prejudicial based solely on the *Brecht* standard. Rather, "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022).[4] That is, if the state court determined that an error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967), that harmlessness determination is also subject to AEDPA's deferential standard of review.

---

[4] In *Brown*, the United States Supreme Court explained that, if the habeas court concludes that an error was harmful under *Brecht*, the petitioner must also satisfy the AEDPA standard to prevail. But, if the habeas court concludes that an error was *not* harmful under *Brecht*, then the inquiry ends, and there is no need for an additional AEPDA/*Chapman* inquiry. 142 S. Ct. at 1528.

Additionally, some types of claims "are analyzed under their own harmless error standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

**3.      Neyhart Is Not Entitled to Habeas Relief on Claim 2(b)**

In Claim 2(b), Neyhart argues that the prosecutor committed misconduct by using unadmitted State's Exhibit 23 to discredit Neyhart, suggesting that Neyhart had lied to police in the 2010 interview when he said he was taking the medication Cymbalta.

### A.      *Factual Basis of Claim 2(b)*

During cross-examination, the prosecutor noted that Neyhart had told Detective White that he was taking Cymbalta at the time of the events giving rise to the charges. The following exchange then took place:

[Neyhart].      I told her the medication is Cymbalta.

[Prosecutor].  Are you sure about that?

A.                    Yes, Ma'am.

Q.                    What if I were to hand you your pharmacy record from 2010, March through May, would that help recall—refresh your memory of what your medication was?

A.          From 2010, March through May, March of 2010 through May of 2010?

Q.          Uh-huh.

A.          And the time in question was from October of 2010?

Q.          Actually, *this is your entire pharmacy record* that Wal-Mart has.

A.          Well, if you'd like, we can go print it. I've already done it and have a copy of it, if you'd like—

….

Q.          And in your interview you said that you were getting whatever medicine it was that was causing your [semen] leakage from Wal-Mart; correct?

A.          Yes, Ma'am.

Q.          And you actually were going to call Wal-Mart right then, weren't you?

A.          Yes, Ma'am.

(State's Lodging A-3 at 772–73 (emphasis added).)

The prosecutor showed Neyhart State's Exhibit 23 (which did not include

Cymbalta) and questioned him about it:

[Prosecutor]. Look at the bottom. When was it printed?

A.          It was printed November 4th, 2010.

Q.          And—

A.          However, this does not include all of the records, Ma'am.

Q.          And when were you taking medicine?

A.          I was taking it on the end of October. This does not include that record, Ma'am. First of all, those records are not—are not added to

this state database until after the 15th of the month, of the next month.

Q.      Well, that's fine. What were you taking prior to the 15th of November, 2010?

A.      Ma'am, these records only go through 5-20 of 2010. I cannot answer that.

Q.      That's because up to the 4th of November, that is all you had taken?

A.      No, Ma'am.

Q.      That's your history right there. What does it say you were taking?

A.      *Ma'am, this document is not accurate.*

Q.      What does it say—

A.      *I have a document that shows something different.*

….

Q.      *And is Cymbalta in there at all?*

A.      *No, Ma'am.*

Q.      *Because you weren't taking Cymbalta, were you?*

A.      *Yes, Ma'am.*

Q.      *Well, it's not on your prescription record, is it?*

A.      *Well, if you'd get an accurate one, it would be.*

Q.      That was accurate as of, I suppose—I mean, you get it from the pharmacy board. They would send it to us. Do you think they would get it right?

A.      This is a pharmacy board report?

Q.      Yes, it is.

A.          *So you know that only narcotics go on there; right?*

Q.          *No. That's not true. Are you an expert? Do you know that?*

A.          I have printed off my medical record for this time period.

Q.          And that's the one we did in 2010. So Wal-Mart got it wrong, I guess?

A.          Apparently. You're welcome to call them and get it.

Q.          *So you weren't taking Cymbalta in 2010,* and you hadn't got a prescription from them for anything since your surgery, had you?

A.          *Ma'am, I have said repeatedly this document is incorrect. Yes, I was taking Cymbalta.* I do not know all the other medications I was on, but I was on other medications as well.

(*Id*. at 773–77 (emphasis added).)

After Neyhart's testimony, defense counsel spoke to the prosecutor and showed her the *actual* pharmacy report establishing that Neyhart *was* taking Cymbalta at the relevant time. The prosecutor thus learned that her previous representation of State's Exhibit 23 was inaccurate. (State's Lodging A-3 at 1001, 1054–66 (transcript of hearing on motion for new trial).) Exhibit 23 was not mentioned again in front of the jury.

### B.     *Clearly Established Law*

The Due Process Clause guarantees the right to a fair trial, and prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). However, such methods will warrant habeas relief only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Case 1:20-cv-00432-CWD   Document 57   Filed 10/17/23   Page 26 of 34

A court must consider the record as a whole when making such a determination, because a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context. *See United States v. Young*, 470 U.S. 1, 16–17 (1985); *Darden*, 477 U.S. at 182 (applying *Young*); *see also Donnelly*, 416 U.S. at 647–48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct … [that] amount[s] to the denial of constitutional due process"). The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

When reviewing prosecutorial misconduct claims under the "unreasonable application" prong of § 2254(d)(1), the Court must keep in mind that the standard is a "very general one," which affords state courts "leeway in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (internal quotation marks and alterations omitted).

### C.     *State Court Decision*

The Idaho Court of Appeals assumed that the prosecutor's use of State's Exhibit 23 was improper. *Neyhart*, 378 P.3d at 1054. The court correctly noted that the State had the burden of establishing, beyond a reasonable doubt, that the assumed error was harmless. *Id.*; *see Chapman*, 386 U.S. at 24. The question, therefore, was "whether the complained-of error [regarding State's Exhibit 23] contributed to the verdict, or whether it was unimportant in relation to everything else the jury considered on the issue of Neyhart's credibility." *Neyhart*, 378 P.3d at 1055.

MEMORANDUM DECISION AND ORDER - 26

The court acknowledged that, in a case in which the evidence is "relatively weak" and essentially involves "a he-said, she-said accounting of events," a defendant's credibility "would be critical to his defense that alleged sexual contact never occurred." *Id*. The court went on, however, to note that Neyhart's was not such a case because of "the State's presentation of evidence corroborating K.S.'s testimony":

> [T]he success of the State's case against Neyhart did not hinge primarily upon the impeachment of Neyhart's version of events. Instead, the jury considered testimonial evidence from multiple witnesses as well as physical evidence of bruising, vaginal redness, and junior-sized underwear with Neyhart's semen on them. Thus, the jury was able to weigh more than merely the testimony of K.S. against that of Neyhart in considering the issue of Neyhart's credibility.

*Id*.

Additionally, there was other substantial evidence that challenged the credibility of Neyhart's version of events:

> The State impeached Neyhart's trial testimony with evidence of his prior inconsistent statements to police investigators. The State also challenged the veracity of Neyhart's wife and mother, each of whom testified favorably to Neyhart.

*Id*.

Finally, the Idaho Court of Appeals held that, because Neyhart's defense with respect to the pink underwear had changed by the time of trial, the issue of Exhibit 23 was not material:

> The complained-of error ultimately resulted in the impeachment of Neyhart's pretrial assertion that a side-effect of his prescription medication caused him to leak semen and that K.S. could have gotten his semen on her underwear by using his toilet. As the State argues, the issue of semen

> leakage became moot during trial when Neyhart and his wife
> both testified that the underwear belonged to Neyhart's wife,
> not to K.S. Therefore, the State's attempted impeachment of
> Neyhart's testimony that he was taking the prescription
> medication at the time of the alleged sexual contact was
> immaterial ….

*Id*. For all of these reasons, the court held that any error with respect to State's Exhibit 23

was harmless beyond a reasonable doubt.

### D.   The State Court's Rejection of Claim 3(c) Was Not Unreasonable under AEDPA

Neyhart attempts to argue that the state court's decision was contrary to federal

law under 28 U.S.C. § 2254(d)(1)(a). He claims that, instead of using the *Chapman*

harmless-error standard, the court should have used the materiality standard applicable to

claims under *Napue v. Illinois*, 360 U.S. 264 (1959). Dkt. 43 at 12. *Napue* prohibits the

government from (1) presenting evidence it knows is false, or (2) failing to correct any

falsity of which it is aware. Success on a *Napue* claim requires a "far lesser showing of

harm" than the showing applicable to claims subject to "ordinary harmless error review."

*Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

The Court concludes that the state court's use of the *Chapman* standard was not

contrary to federal law. Claim 2(b) does not assert a *Napue* violation; in fact, it could not.

There was no false evidence presented to the jury regarding State's Exhibit 23. The only

actual evidence presented about that document was Neyhart's *truthful* testimony that the

document did not list Cymbalta because it was a narcotics-only list. The prosecutor's

questions and incorrect comments about the document—that it was a pharmacy record

and that it listed all of Neyhart's medications at the time of the incident—were not

evidence, and the trial court instructed the jury accordingly. (*See* State's Lodging A-3 at 816–17.) Therefore, the Idaho Court of Appeals applied the correct harmless-error standard.

The next question is whether the Idaho Court of Appeals also reasonably applied the *Chapman* standard. The Court concludes that it did.

The evidence against Neyhart was overwhelming. It consisted not just of direct testimony, but also medical and scientific evidence. Neyhart's defense was weak. It rested on the claim that the pink underwear with monkeys belonged to Neyhart's wife and that a relative of K.S. framed Neyhart by stealing them from Neyhart's trailer and planting them in K.S.'s house. In addition, if the underwear belonged to Neyhart's wife, then Neyhart's assertions about Cymbalta having caused his semen to come into contact with K.S.'s underwear, including whether or not he was taking Cymbalta, were immaterial.

Plenty of evidence established Neyhart's guilt beyond a reasonable doubt, leaving no room for this Court to second-guess the state appellate court's harmlessness determination. *See Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (stating that AEDPA does not permit federal courts to use "federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts"). Consequently, Claim 2(b) must be denied.

**4.      Petitioner Is Not Entitled to Habeas Relief on Claim 3(c)**

Claim 3(c) asserts that trial counsel rendered ineffective assistance by failing to make a timely motion, under Idaho Rule of Evidence 412, to admit evidence of K.S.'s

prior sexual conduct. A defendant seeking to introduce such evidence must file a motion

at least five days before trial. Idaho R. Evid. 412(c)(1).

### A.  *Factual Basis of Claim 3(c)*

The charges against Neyhart were based on genital-to-genital contact. *See* Idaho

Code § 18-1508 ("Any person who shall commit any lewd or lascivious act or acts upon

… a minor child under the age of sixteen (16) years, including but not limited to, genital-

genital contact, oral-genital contact, anal-genital contact, oral-anal contact, manual-anal

contact, or manual-genital contact, … shall be guilty of a felony."). Thus, to convict

Neyhart, the State had to prove that his genitals had contact with K.S.'s genitals.

In her CARES interview, K.S. talked about what Neyhart had done to her. In

response to a question of whether anyone else had ever done something similar, K.S.

stated that a friend had previously engaged in the same conduct with her.

The day of trial, defense counsel moved to admit the CARES interview because

K.S.'s friend was female. Counsel argued:

> [T]he child that she refers to as having committed the same
> acts as the defendant in this case is, in fact, female. And so
> for [K.S.] to state that the same act was committed indicates
> that, number one, [K.S.'s friend] does not possess a penis, to
> the best of my knowledge. Therefore, if it was the same
> conduct, it could not involve [the] penis. And the state has
> alleged genital-to-genital contact. Therefore, we seek to use
> that for impeachment purposes, that, if it's the same kind of
> conduct, how is it that this child is female and does not
> possess genitalia as she has alleged.

(State's Lodging A-3 at 149.)

The trial court denied the motion as untimely and also on the merits. The motion was untimely because it was not filed five or more days before trial. (*Id.* at 165–66.)

On the merits, the trial court found that, even if the evidence were admissible under Rule 412, the court would exclude it under Rule 403. (*Id.* at 167–68.) *See* Idaho R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). The court held that, unless the state opened the door to the evidence of K.S.'s prior sexual conduct, the defense could not introduce the CARES interview in which K.S. discussed that conduct. (State's Lodging A-3 at 169.)

However, the prosecution and defense later *stipulated* to admit the videotape of K.S.'s CARES interview. (*Id.* at 447–52.) As a result, after K.S.'s testimony, the jurors watched the video and heard K.S.'s statement that her female friend had previously engaged in the same conduct that Neyhart had.

During closing, defense counsel argued to the jury that Neyhart could not possibly have had genital-to-genital contact with K.S., because K.S. described the conduct of both Neyhart and her female friend as the same:

> I didn't hear the state mention anything about [K.S.'s friend]. Do you remember in the CARES interview where [K.S.] stated that she had done the same thing with [this friend]? That's strange. [The friend] is a girl, ladies and gentlemen. She does not possess a penis. How is it possible to engage in the same conduct with a female when she alleges that [Neyhart's] bottom touched her bottom? It's not consistent.
>
> …

> And if you go and look at that CARES interview, which I very much urge
> you to do, you'll see that in her testimony she claims she was engaging
> with the same conduct ….

(*Id*. at 864–65.)

### B.    Clearly Established Law

The Sixth Amendment to the United States Constitution provides that a criminal

defendant has a right to the effective assistance of counsel in his defense. The Supreme

Court explained the standard for ineffective assistance claims in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel

("IAC") must show that (1) "counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and

(2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a

trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient

performance and prejudice to prove an IAC claim. *Id.* at 697. On habeas review, a court

may consider either prong of the *Strickland* test first, or it may address both prongs, even

if one prong is not satisfied and would compel denial of the IAC claim. *Id.*

### C.    State Court Decision

In addressing whether counsel rendered ineffective assistance, the Idaho Court of

Appeals held that Neyhart could not show prejudice under *Strickland*, because even a

timely motion would have been denied.[5] "Although the trial court denied Neyhart's Rule

---

[5] The court of appeals also appeared to conclude that Neyhart's counsel did not perform deficiently, but it is unnecessary for this Court to address that question. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

MEMORANDUM DECISION AND ORDER - 32

412 motion as untimely, the trial court's comments also show that the motion would not have likely succeeded regardless because the trial court viewed the potential evidence as too prejudicial under Rule 403." (State's Lodging D-4 at 8.) Because the trial court alternatively held that the evidence would be excluded under Rule 403, even a timely motion to admit the CARES interview would have been denied.

Additionally, the court of appeals relied on the fact that the jury actually *did* watch the CARES interview—which is precisely what defense counsel requested in the Rule 412 motion and which caused the trial court "to withdraw its prior order prohibiting Neyhart from using the evidence." (*Id*.) For these reasons, the state court held that Neyhart could not establish *Strickland* prejudice.

### D.    The State Court's Rejection of Claim 3(c) Was Not Unreasonable under AEDPA

The Idaho Court of Appeals' denial of Claim 3(c) decision was a reasonable application of *Strickland*. The trial court made clear that it would have denied the Rule 412 motion even if it had been timely filed, and the jury ultimately heard the evidence that defense counsel sought to admit. Because Neyhart cannot show prejudice from his counsel's failure to file a timely Rule 412 motion with respect to the victim's prior sexual conduct, Claim 3(c) must be denied.

## CONCLUSION

For the foregoing reasons, Claim 1 is subject to dismissal, and Neyhart's remaining claims fail on the merits. Because all other claims have already been dismissed, judgment will be entered in favor of Respondent.

## ORDER

**IT IS ORDERED:**

1.     The Petition for Writ of Habeas Corpus is DENIED, and this entire action

       is DISMISSED with prejudice.

2.     The Court does not find its resolution of this habeas matter to be reasonably

       debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

       § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If

       Petitioner wishes to appeal, he must file a timely notice of appeal with the

       Clerk of Court. Petitioner may seek a certificate of appealability from the

       Ninth Circuit by filing a request in that court.


DATED: October 17, 2023

Honorable Candy W. Dale
U.S. Magistrate Judge